UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SUZANNE MATTSON,<br><br>                Plaintiff,<br><br>v.<br><br>UNITED SERVICES AUTOMOBILE ASSOCIATION and DOES 1- 15,<br><br>                Defendants. | Case No.: 18cv222 JM (KSC)<br><br>**ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

Defendant USAA Casualty Insurance Company ("USAA"), erroneously sued as United Services Automobile Association, moves for summary judgment on Plaintiff Suzanne Mattson's claims. (Doc. No. 17.) Plaintiff opposes. (Doc. No. 18.) After careful consideration of the parties' arguments and the summary judgment record, the court denies USAA's motion for summary judgment.

## BACKGROUND

Plaintiff Suzanne Mattson filed this action in state court on December 22, 2017, alleging claims for breach of contract and breach of the implied covenant of good faith and

fair dealing against her insurance company, USAA. (Doc. No. 1, Exh. A. at 5-11.)[1] On January 31, 2018, USAA removed this action to federal court on diversity jurisdiction grounds. (Doc. No. 1.)

USAA issued Plaintiff an automobile policy insuring Plaintiff for bodily injury coverage in the event that an underinsured motorist caused injury or damage to Plaintiff's person. Plaintiff's claims against USAA arise out of a December 4, 2011 automobile accident. Unless otherwise noted, the following facts are not disputed.

**Prior Accidents**

Before the accident in this case, Plaintiff was involved in two other automobile accidents in July and August of 2010, after which, Plaintiff's treating orthopedic surgeon, Dr. Neil Tayyab, obtained x-rays of Plaintiff's spine which revealed cervical spondylosis at the C5-C6 level and lumbar degeneration. (Doc. No. 17-4, Exh. 3 at 74.) Dr. Tayyab opined that these conditions were aggravated by Plaintiff's automobile accidents. (Id.) Ultimately, Dr. Tayyab concluded that Plaintiff's physical therapy and acupuncture improved her symptoms significantly. (Doc. No. 17-4, Exh. 3 at 80.) On September 19, 2011, Plaintiff was discharged from her physical therapy after she reported that her symptoms were much improved. (Doc. No. 17-4, Exh. 5 at 97.)[2]

**December 4, 2011 Accident and Treatment**

On December 4, 2011, Plaintiff, a self-employed hair stylist, was driving to Los Angeles to cut a client's hair when her vehicle was struck from behind by Allan Lopez-Chua. Plaintiff reported the accident to USAA the next day. (Doc. No. 17-2, Becker Decl. ¶ 15.) Plaintiff has not been involved in any automobile accidents since.

Following the December 4, 2011 accident, Plaintiff received treatment from several medical professionals and attended physical therapy and acupuncture treatments. On

---

[1] All page citations in this order refer to those created by the court's CM/ECF system.
[2] USAA argues that Plaintiff stopped physical therapy because her "med pay" was depleted. (Doc. No. 17 at 10-11.) This argument is addressed below.

July 25, 2012, Dr. Tayyab concluded from an MRI of Plaintiff's cervical spine that, compared to Plaintiff's May 2, 2011 imaging (prior to the accident at issue), there was an "[i]nterval enlargement of a disc protrusion at the C4-C5 level which is now causing mild to moderate central stenosis." (Doc. No. 18-1, Exh. G at 72.) Dr. Tayyab recommended Plaintiff continue with her physical therapy and acupuncture treatments. (Id.) On November 12, 2012, Dr. Tayyab opined that Plaintiff had significant cervical spine degeneration. (Doc. No. 17-4, Exh. 3 at 80.) On May 21, 2013, a report of an MRI of Plaintiff's cervical spine indicated a 3mm disc protrusion touching Plaintiff's spinal cord at the C4-C5 level, and a 2mm disc protrusion at the C5-C6 level. (Doc. No. 18-1, Exh. G at 74.) Plaintiff argues that the 3mm disc protrusion touching the spinal cord at the C4-C5 level did not exist prior to the December 4, 2011 accident. The report also found narrowing of Plaintiff's central canal and neural foramen at the C4-C5 and C5-C6 levels. (Id.) Plaintiff underwent breast reduction surgery on February 26, 2013, to, among other stated reasons, reduce her "medical symptoms." (Doc. No. 17-4, Exh. 8 at 126-27.)[3]

On June 25, 2012, Plaintiff retained counsel, Douglas H. Swope, to represent her in claims arising out of the December 4, 2011 accident. (Doc. No. 17-4, Exh. 7 at 117-124.) Plaintiff pursued her claims against Lopez-Chua. Almost three years later, on September 24, 2014, Lopez-Chua's insurer, Farmers Insurance Company, settled the case against the underinsured Lopez-Chua for the $50,000 policy limit.

**USAA's Handling of Plaintiff's Claim**

On November 19, 2013, USAA notified Plaintiff's counsel that it had paid $22,543.03 in medical benefits to Plaintiff. (Doc. No. 17-2, Becker Decl. ¶ 14.) By facsimile on October 13, 2014, Plaintiff, through counsel, notified USAA that she settled her case against the at-fault driver (and his insurer, Farmers) for the policy limit of $50,000; requested that USAA waive its medical reimbursement rights (the $22,543.03 paid by

---

[3] USAA's arguments relating to Plaintiff's breast reduction surgery are addressed below.

USAA); and agreed that USAA could offset the $50,000 settlement amount from USAA's underinsured motorist insurance ("UIM") policy limit of $300,000. Also on October 13, 2014, by certified letter, Plaintiff demanded arbitration of her claims.

The parties then engaged in an exchange of numerous medical documents from various treating physicians. In October or November of 2014, Plaintiff's counsel provided USAA with medical records and a letter stating that this included all of Plaintiff's medical records in his possession. (Doc. No. 17-4, Exh. 10 at 134; Doc. No. 18-3, Swope Decl. ¶ 4.) This transmission did not include the May 21, 2013 MRI report as Plaintiff's counsel did not have this document. (Doc. No. 18-3, Swope Decl. ¶ 8.) USAA does not dispute that its counsel, Scott Laqua, obtained the report at some point after becoming involved in the case. (See Doc. No. 19.)

On November 21, 2014, USAA had a registered nurse review Plaintiff's medical records. (Doc. No. 17-4, Exh. 11 at 136-40.) The nurse opined that the December 4, 2011 accident most likely exacerbated Plaintiff's preexisting cervical spine issues. (Id. at 139.) The nurse opined that Plaintiff's condition was also likely aggravated by her work and that her treatment had been excessive. (Id.) The nurse found that Plaintiff's breast reduction surgery likely helped her pain, and that physical therapy and losing weight would also be helpful. (Id.) As is further discussed below, the nurse did not appear to review Plaintiff's May 21, 2013 MRI report.

On January 20, 2015, USAA requested additional medical records relating to Plaintiff's breast reduction surgery, which Plaintiff's counsel provided on March 12, 2015. (Doc. No. 17-2, Becker Decl. ¶¶ 20-22.) On April 29, 2015, USAA offered Plaintiff $1,500, in addition to the amount it had already paid, to settle her claim. (Doc. No. 17-2, Becker Decl. ¶ 23.) Plaintiff rejected this offer. (Id.)

On September 10, 2015, USAA deposed Plaintiff. (Doc. No. 17-4, Exh. 6 at 100-115.) Shortly after, USAA retained Dr. Larry D. Dodge, MD, to examine Plaintiff. Dr. Dodge examined Plaintiff on November 19, 2015. (Doc. No. 17-4, Exh. 2.) After examining Plaintiff and reviewing her medical records, Dr. Dodge concluded that the

December 4, 2011 accident caused at least a temporary aggravation of Plaintiff's cervical spine degenerative disc disease and her right shoulder tendinitis. (Id. at 71.) He also opined that Plaintiff's breast reduction surgery did not have any relationship to the December 4, 2011 accident and that up to six visits with Dr. Tayyab, the July 9, 2012 MRI scan, and up to twenty physical therapy or acupuncture treatments were reasonable following the 2011 accident. (Id.) He saw no reason to continue treatment. (Id.) As is further discussed below, the parties dispute whether Dr. Dodge reviewed the May 21, 2013 MRI report in formulating his opinion.

On January 19, 2016, USAA requested Plaintiff attend a batch settlement. (Doc. No. 17-2, Becker Decl. ¶ 25.) Plaintiff declined this request. (Id.) On April 20, 2016, Plaintiff offered to settle the matter for $185,000. (Doc. No. 17-2, Becker Decl. ¶ 24.) USAA rejected this offer, and on April 25, 2016, USAA offered to settle the matter for $60,000. (Id.) Plaintiff rejected this offer. (Id.)

Almost a year later, on April 19, 2017, Hon. J. Richard Haden (Ret.) arbitrated Plaintiff's claim. (Id. ¶ 27.) He found the following:

> Ms. Mattson's December 4, 2011 accident significantly exacerbated her prior cervical spine symptoms. While her pain from the prior two accidents together with any preexisting disc disease had resolved at least temporarily for the two months prior to her third accident, that pain may well have reoccurred over time as part of the waxing and waning process Dr. Dodge described. However, the pain she sustained as a result of that third accident has not "waxed and waned." It remains constant.

(Doc. No. 18-3, Exh. F at 32.)[4] Accordingly, the arbitrator awarded Plaintiff the full remaining policy limit of $250,000 as compensatory damages. The following amounts were deducted from this award: $8,294.87 in arbitration costs, $25,984.66 in medical bills, and $95,000 in attorneys' fees. (Doc. No. 17-4, Exh. 18 at 219.) As a result, Plaintiff received a check for $120,720.47. (Id.)

---

[4] Neither party provided the arbitrator with the May 21, 2013 MRI report.

**LEGAL STANDARDS**

A motion for summary judgment shall be granted where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of informing the court of the basis for its motion and identifying those portions of the file that it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). But Federal Rule of Civil Procedure 56 contains "no express or implied requirement . . . that the moving party support its motion with affidavits or other similar materials negating the opponent's claim." Id. (emphasis in original).

In response to a motion for summary judgment, the nonmoving party cannot rest on the mere allegations or denials of a pleading but must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Id. at 324 (internal citations omitted). In other words, the nonmoving party may not rely solely on conclusory allegations unsupported by factual data. Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989). The court must examine the evidence in the light most favorable to the nonmoving party, United States v. Diebold, Inc., 369 U.S. 654, 655 (1962), and any doubt as to the existence of an issue of material fact requires denial of the motion, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

**DISCUSSION**

**I.    Breach of the Duty of Good Faith and Fair Dealing**

"In essence, the covenant is implied as a *supplement* to the express contractual covenants, to prevent a contracting party from engaging in conduct which (while not technically transgressing the express covenants) frustrates the other party's rights to the benefits of the contract." Love v. Fire Ins. Exch., 221 Cal. App. 3d 1136, 1153 (1990) (emphasis in original). Thus, "when benefits are due an insured, 'delayed payment based on inadequate or tardy investigations, oppressive conduct by claims adjusters seeking to reduce the amounts legitimately payable and numerous other tactics may breach the

implied covenant because' they frustrate the insured's right to receive the benefits of the contract in 'prompt compensation for losses.'" Waller v. Truck Ins. Exch., Inc., 11 Cal. 4th 1, 36 (1995) (quoting Love, 221 Cal. App. 3d at 1153). Accord Wilson v. 21st Century Ins. Co., 42 Cal. 4th 713, 723 (2007) (insurer's unreasonable denial of or delay in paying benefits is a breach of the duty of good faith and fair dealing). To prove a claim for breach of the implied covenant of good faith and fair dealing in the first party insurance context, a plaintiff must establish (1) benefits due under the policy were withheld, and (2) the withholding was unreasonable. Wilson, 42 Cal. 4th at 720.

### A. Good Faith Denial and the Genuine Dispute Rule

"While an insurance company has no obligation under the implied covenant of good faith and fair dealing to pay every claim its insured makes, the insurer cannot deny the claim without fully investigating the grounds for its denial." Id. at 720-21 (quotations and citation omitted). "To protect its insured's contractual interest in security and peace of mind, 'it is essential that an insurer fully inquire into possible bases that might support the insured's claim' before denying it." Id. (quoting Egan v. Mutual of Omaha Ins. Co., 24 Cal. 3d 809, 819 (1979)). "By the same token, denial of a claim on a basis unfounded in the facts known to the insurer, or contradicted by those facts, may be deemed unreasonable." Wilson, 42 Cal. 4th at 721. "A trier of fact may find that an insurer acted unreasonably if the insurer ignores evidence available to it which supports the claim. The insurer may not just focus on those facts which justify denial of the claim." Id. (quoting Mariscal v. Old Republic Life Ins. Co., 42 Cal. App. 4th 1617, 1623 (1996)).

"[A]n insurer denying or delaying the payment of policy benefits due to the existence of a genuine dispute with its insured as to the existence of coverage liability or the amount of the insured's coverage claim is not liable in bad faith even though it might be liable for breach of contract." Wilson, 42 Cal. 4th at 723 (quoting Chateau Chamberay Homeowners Ass'n v. Associated Int'l Ins. Co., 90 Cal. App. 4th 335, 347 (2001)). "The genuine dispute rule does not relieve an insurer from its obligation to thoroughly and fairly investigate, process and evaluate the insured's claim. A *genuine* dispute exists only where the insurer's

position is maintained in good faith and on reasonable grounds." Wilson, 42 Cal. 4th at 724 (emphasis in original).

"[T]he reasonableness of an insurer's claims-handling conduct is ordinarily a question of fact." Amadeo v. Principal Mut. Life Ins. Co., 290 F.3d 1152, 1161 (9th Cir. 2002) (quoting Chateau Chamberay Homeowners Ass'n, 90 Cal. App. 4th at 346). "[A]n insurer is not entitled to judgment as a matter of law where, viewing the facts in the light most favorable to the plaintiff, a jury could conclude that the insurer acted unreasonably." Wilson, 42 Cal. 4th at 724 (quoting Amadeo, 290 F.3d at 1161-62).

Plaintiff argues that USAA failed to thoroughly investigate and evaluate her claim. USAA argues that there was a genuine dispute about whether Plaintiff's chronic pain and breast reduction surgery were proximately caused by the December 4, 2011 accident as her medical records indicate that she had preexisting degenerative disc disease, arthritis, and injuries from prior unrelated accidents. USAA argues that it considered Plaintiff's medical records and the relatively minor damage, totaling less than $4,000, to Plaintiff's vehicle. The court finds that there are genuine issues of material fact as to whether USAA's investigation, evaluation, and settlement of Plaintiff's claim was reasonable.

**1. USAA's Characterization of the Factual Record**

As an initial matter, the court notes that USAA impermissibly mischaracterizes the evidence on several factual issues. First, USAA argues that Plaintiff admitted in her deposition that she stopped her physical therapy treatments prior to the December 4, 2011 accident because her "med pay" had expired, not because she was feeling better. (Doc. No. 17 at 10.) In the deposition transcript excerpts before the court, Plaintiff makes no such statement.[5]

---

[5] USAA cites to the following exchange between counsel and Plaintiff at Plaintiff's September 4, 2014 deposition: "Q: And after the Chua accident, when did you first go to Girard Orthopedics? A: Girard Orthopedics is where Dr. Tayyab is, so are you asking— Dr. Tayyab or for the physical therapy? Q: The physical therapy? A: Okay. I believe that was probably a year after the accident because the med pay was finished, but I don't recall

8

Second, USAA argues that "[t]he evidence shows that Plaintiff underwent breast surgery for cosmetic purposes to correct symmetry issues that she had since she was a teenager and to reduce their large size which was caused by weight gain." (Doc. No. 17 at 26.) The evidence indicates that asymmetries in Plaintiff's breasts were corrected decades before her breast reduction surgery. In 1979, Plaintiff had breast surgery to correct the significant asymmetry of her breasts, a birth defect. (Doc. No. 17-4, Exh. 4 at 91-92.) The surgery decreased the size of one breast and increased the size of the other breast so that they were symmetrical. (Id.; Doc. No. 17-4, Exh. 6 at 103-104.) In her September 10, 2015 deposition, Plaintiff testified that after this surgery and when Plaintiff was in her twenties, her breasts became very large and remained that way for over two decades. (Doc. No. 17-4, Exh. 6 at 104-106.) In her deposition for this case, Plaintiff testified that she did not want to have breast reduction surgery and had "tried everything," but "it was not a choice" because her neck and shoulder pain was so severe. (Doc. No. 18-1, Exh. E at 51-52.) The surgeon's report from Plaintiff's breast reduction surgery describes Plaintiff as "a 48-year-old female who has gained excessive weight, has become very large in her breast, [sic] and now has fairly large, heavy, pendulous breasts, but with [sic] asymmetrical when younger and had an implant put in her left breast." (Doc. No. 17-4, Exh. 8 at 126.) The surgeon indicated that Plaintiff "now wants to be smaller, reduce her medical symptoms, as well as removal of her implant." (Id.) USAA cites no evidence suggesting that Plaintiff's breast reduction surgery was meant to correct asymmetries in her breasts. USAA further misrepresents the record when it argues that the nurse it retained to evaluate Plaintiff's medical records concluded "that Plaintiff's breast reduction surgery may not have been necessary because Plaintiff could have achieved the same result through weight loss." (Doc. No. 17 at 24.) To the contrary, the nurse's report states that "[t]he breast

---

the exact date." (Doc. No. 17-4, Exh. 4 at 94-95) (emphasis added.) Here, Plaintiff testifies that <u>after</u> the December 4, 2011 accident she went to Girard Orthopedics, after her med pay expired.

reduction surgery [Plaintiff] had may help her pain and so would loosing [sic] excess weight." (Doc. No. 17-4, Exh. 11 at 139.) In light of the significant factual disputes discussed below, the court finds defense counsel's mischaracterization of the evidence particularly concerning.

**2. USAA's Investigation, Valuation and Settlement of Plaintiff's Claim**

The reasonableness of an insurer's actions "must be evaluated as of the time that they were made." <u>Chateau Chamberay Homeowners Ass'n</u>, 90 Cal. App. 4th at 347. Here, a jury could find USAA's investigation, evaluation, and settlement of Plaintiff's claim was unreasonable for several reasons.

First, a jury could find that USAA's initial settlement offer was unreasonable in light of the information USAA possessed at the time the offer was made. On April 29, 2015, USAA offered Plaintiff $1,500 to settle her claim. The USAA claims handler assigned to Plaintiff's claim testified at her deposition that she had questions about whether the December 4, 2011 accident was related to Plaintiff's breast reduction surgery and the extent to which her injuries were caused by the two prior accidents. (Doc. No. 17-4, Exh. 12 at 144-45.) In addition, USAA's attorney handling Plaintiff's claim, Scott Laqua, testified at his deposition that he was not sure whether Plaintiff suffered any injury as a result of the December 4, 2011 accident because of her history of degenerative disease "[a]nd the structural issues that were on the M.R.I.'s, both before and after the accident, did not suggest *any* injury . . . ." (Doc. No. 17-4, Exh. 13 at 149-50) (emphasis added.)

At the time USAA made its $1,500 offer, it had been in possession of Plaintiff's medical records for several months. These records indicated that Plaintiff's treating orthopedic surgeon, Dr. Tayyab, compared Plaintiff's pre- and post-2011 accident MRI's to conclude that after the December 4, 2011 accident there was an "[i]nterval enlargement of a disc protrusion at the C4-C5 level which is now causing mild to moderate central stenosis." (Doc. No. 18-1, Exh. G at 72.) USAA does not dispute Dr. Tayyab's conclusion that after the 2011 accident, the protrusion on Plaintiff's cervical spine was enlarged and causing mild to moderate central stenosis. Plaintiff's medical records also establish that

10

Plaintiff consistently reported she was experiencing significant pain and that she received treatment for this pain.

Before USAA made its $1,500 offer, it retained a nurse to review Plaintiff's medical records. The nurse concluded that the December 4, 2011 accident most likely exacerbated Plaintiff's preexisting cervical spine issues, Plaintiff's injuries were also likely exacerbated by her work, and Plaintiff's treatment had been excessive. (Doc. No. 17-4, Exh. 11 at 136-40.) But the nurse's report specifically stated that it was not within the scope of the report "to confirm that the injuries claimed were actually sustained as a result of the reported accident." (Id. at 140.) USAA did not have a physician review Plaintiff's medical records, did not speak to Plaintiff's medical providers, and did not examine Plaintiff prior to its $1,500 offer.[6]

In other words, at the time USAA made Plaintiff a $1,500 settlement offer, it had medical evidence indicating that after the December 4, 2011 accident, Plaintiff suffered serious injuries, including an enlargement of the cervical disc protrusion at the C5-C6 level of her spine. But USAA did not have any expert medical opinion suggesting that these injuries were not caused by the 2011 accident. Nonetheless, USAA offered Plaintiff a mere $1,500 for her claim. A jury could find that this offer was unreasonably low. See Brehm v. 21st Cent. Ins., 166 Cal. App. 4th 1225 (2008) (holding that insurer's "unreasonably low" settlement offer "in light of the medical evidence in its possession at that time" was evidence of bad faith).

Second, the parties dispute whether USAA failed to consider an MRI report in its possession that showed significant damage to Plaintiff's spine. A May 21, 2013 MRI report indicated a 3mm disc protrusion was touching Plaintiff's spinal cord at the C4-C5 level, and a 2mm disc protrusion existed at the C5-C6 level. (Doc. No. 18-1, Exh. G at 74.) The report also found narrowing of Plaintiff's central canal and neural foramen at the

---

[6] Dr. Dodge issued his report on November 19, 2015. (Doc. No. 17-4, Exh. 2 at 61.)

C4-C5 and C5-C6 levels. (Id.) Plaintiff argues that this was the first MRI to show that a disc protrusion was in contact with Plaintiff's spinal cord, causing Plaintiff significant pain. (Doc. No. 18 at 20.) USAA does not dispute that it possessed the May 21, 2013 MRI report. But it is not clear from the record whether USAA considered this report in its evaluation of Plaintiff's claim. The record does not clearly indicate when USAA obtained this MRI report or whether its medical experts, claims handler, or attorney considered the report when evaluating Plaintiff's claim. The nurse's report summarizes Plaintiff's medical records by date but makes no mention of the May 2013 MRI. (See Doc. No. 17-4, Exh. 11 at 136-40.) USAA does not assert that the nurse it retained reviewed the May 2013 MRI report. Likewise, Dr. Dodge's report provides a detailed history of Plaintiff's medical records by date but nowhere mentions the May 2013 MRI. (See Doc. No. 17-4, Exh. 2 at 61-72.) Both parties request that the court draw inferences about when USAA received this report and who considered it. Plaintiff's prior counsel, Douglas Swope, declares that his file never contained the May 21, 2013 MRI report. (Doc. No. 18-3, Swope Decl. ¶ 8.) Plaintiff argues that USAA's attorney, Scott Laqua, possessed the document but intentionally kept it from anyone else. In its reply brief, USAA's counsel attaches an email she sent to Plaintiff's counsel on March 11, 2019, stating that Laqua sent a letter to Dr. Dodge, dated November 16, 2015, enclosing "[r]ecords from Barry Broomberg, M.D." (Doc. No. 19-1, Exh. B at 9.) USAA's counsel then attaches the May 21, 2013 MRI report as the "relevant documents" from Dr. Broomberg's records. (Doc. No. 19-1, Exh. D.) The court leaves such inferences about when USAA received this important document, whether USAA's medical experts considered the report, and whether USAA's consideration of the report would have altered its evaluation of Plaintiff's claim to a jury, especially when much of the evidence on this issue lacks foundation.

Third, on April 25, 2016, USAA offered Plaintiff $60,000 to settle her claim. USAA does not explain why it offered Plaintiff $58,500 more (40 times the amount of its original and only other offer) to settle her claim. This was the only other time USAA offered Plaintiff any amount to settle her claim. Ultimately, after Plaintiff rejected this offer and

12

18cv222 JM (KSC)

two years and six months after Plaintiff first requested the remaining policy benefit of $250,000, the matter proceeded to arbitration.

Lastly, Plaintiff testified that USAA's attorney, Laqua, called Plaintiff a liar in front of the arbitrator and her attorney, refused to speak with Plaintiff's witnesses, told Plaintiff that she does not work as much as she says she does, and told Plaintiff that she is unprofessional and incompetent. (Doc. No. 18-1, Exh. E at 47.) Plaintiff also testified that she felt demeaned by Laqua's questioning of her breast reduction surgery. (Id. at 51-52.) This evidence, viewed in the light most favorable to Plaintiff, could indicate bias in USAA's investigation and settlement of Plaintiff's claim. See Hicks v. Progressive Cas. Ins. Co., 686 F. App'x 417, 418 (9th Cir. 2017) (evidence of insurer calling the insured a liar and undermining the insured's credibility throughout the investigation and during arbitration was relevant to show bias against its insured and bad faith) (citing White v. W. Title Ins., 40 Cal. 3d 870 (1985)).

### 3. Arbitration of Plaintiff's Claim

"The size of the arbitration award, if it substantially exceeds the insurer's offer, although not conclusive, furnishes an inference that the value of the claim is the equivalent of the amount of the award . . . . " Hicks, 686 F. App'x at 418 (citing Robert C. Clifford & Paul A. Eisler, California Uninsured Motorist Law § 24.11 (2016); Crisci v. Sec. Ins. Co. of New Haven, Conn., 66 Cal. 2d 425, 58 (1967)). Here, the arbitrator awarded Plaintiff the full remaining policy benefit of $250,000. The immense gap between the amount Plaintiff was awarded and USAA's initial offer of $1,500 and subsequent offer of $60,000 a year later, at a minimum, further supports the conclusion that genuine issues of material fact exist as to whether USAA's conduct was reasonable. See id.

USAA argues that Plaintiff, not USAA, requested arbitration and that it was entitled to take this matter to arbitration under the policy and insurance code. As discussed above, there are genuine issues of material fact as to whether USAA unreasonably forced Plaintiff to attend arbitration by failing to reasonably investigate, evaluate, and settle Plaintiff's claim. Furthermore, the right to arbitrate a claim does not obviate an insurer's duty to act

reasonably and in good faith. Brehm, 166 Cal. App. 4th at 1241-42 (holding that the right to arbitrate an UIM claim does not relieve an insurer from its obligation to deal with its insured in good faith).

In sum, a jury could conclude that USAA acted unreasonably when it failed to reasonably investigate, evaluate, or settle Plaintiff's claim. See Maslo v. Ameriprise Auto & Home Ins., 227 Cal. App. 4th 626, 636-37 (2014) ("Our Supreme Court has made clear that there can be no genuine dispute in the absence of a thorough and fair investigation.") (citing Wilson, 42 Cal. 4th at 723).

**B. Economic Loss**

USAA argues that Plaintiff's breach of the implied covenant of good faith and fair dealing fails because she did not suffer any economic loss. "[A] delay in paying policy benefits, even if in an unreasonable manner, does not *in itself* establish economic loss to the plaintiff." Maxwell v. Fire Ins. Exch., 60 Cal. App. 4th 1446, 1450 (1998) (emphasis added). "[T]he award of damages in bad faith cases for personal injury, including emotional distress, is incidental to the award of economic damages." Id. (citing Waters v. United Servs. Auto. Assn., 41 Cal. App. 4th 1063, 1072 (1996)). "This is so because bad faith actions seek recovery of a property interest, not personal injury." Maxwell, 60 Cal. App. 4th at 1450.

In Brandt v. Superior Court, 37 Cal. 3d 813 (1985), the California Supreme Court held that "[w]hen an insurer's tortious conduct reasonably compels the insured to retain an attorney to obtain the benefits due under a policy, it follows that the insurer should be liable in a tort action for that expense." Id. at 817. "The attorney's fees are an economic loss - damages - proximately caused by the tort." Id. "Th[is] rule permitting recovery of attorney fees as damages in insurance bad faith cases is now well settled." Cassim v. Allstate Ins. Co., 33 Cal. 4th 780, 806 (2004).[7] As discussed above, genuine issues of material fact exist

---

[7] USAA's arguments about the timing of Plaintiff's retention of counsel go to the amount of attorney's fees Plaintiff may recover, not whether she is entitled to recover any fees.

14

as to whether USAA acted reasonably. It is not disputed that Plaintiff retained Swope to represent her in matters arising out of the injuries she suffered from the December 4, 2011 accident. (Doc. No. 17-4, Exh. 7 at 117.) Accordingly, as a result of USAA's withholding of benefits, there is a genuine issue of material fact as to whether Plaintiff reasonably incurred the cost of retaining a lawyer to negotiate with USAA and arbitrate her claim in an effort to obtain the benefits due under the policy.[8] USAA's request for summary judgment on Plaintiff's breach of the implied covenant of good faith and fair dealing claim is denied.

## II. Breach of Contract

### A. Unreasonable Delay in Payment of Benefits

"The standard elements of a claim for breach of contract are: (1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) damage to plaintiff therefrom." Wall St. Network, Ltd. v. New York Times Co., 164 Cal. App. 4th 1171, 1178 (2008).

USAA moves for summary judgment on Plaintiff's breach of contract claim on the ground that California law "holds that **there can be no breach of contract where all of the contractual benefits have been paid, even if they were paid late**." (Doc. No. 19 at 18) (emphasis in original.) The cases USAA cites do not stand for the broad proposition that an insured is barred from asserting a breach of contract claim if the insurer ultimately pays the policy benefits, regardless of the reasonableness of the delay or costs incurred as

---

See Brandt, 37 Cal. 3d at 819 ("The fees recoverable, however, may not exceed the amount attributable to the attorney's efforts to obtain the rejected payment due on the insurance contract."). Accord Cassim, 33 Cal. 4th at 807.

[8] USAA also argues that Plaintiff "had a net economic gain" because she ultimately received a check for over $120,000 and would not have received that much if USAA had accepted her pre-arbitration settlement offer. (Doc. No. 17 at 8.) USAA provides no authority to support its questionable accounting or its disregard of the fact that the arbitrator found Plaintiff was entitled to the full remaining policy benefit of $250,000, but Plaintiff received only $120,000.

15

18cv222 JM (KSC)

a foreseeable result of the insurer's conduct. Instead, the cases cited by USAA analyze whether the defendant breached the contract and whether plaintiff's claimed damages were a reasonably foreseeable result of the breach of contract. See Behnke v. State Farm Gen. Ins. Co., 196 Cal. App. 4th 1443, 1467 (2011) (affirming grant of summary judgment for insurer when policy language did not require insurer to pay claimed benefits and all other claimed damages were not reasonably foreseeable at the time the parties entered into the contract); Maxwell, 60 Cal. App. 4th at 1449 ("[Plaintiff's] contentions with respect to the breach of contract cause of action require no discussion. It is not disputed that all sums due under the judgment, including interest, have been paid in full and appellant does not assert any damages other than emotional distress."); Everett v. State Farm Gen. Ins. Co., 162 Cal. App. 4th 649, 659-61 (2008) (interpreting policy language to hold insurer did not owe claimed benefits and thus did not breach the contract). See also Case v. State Farm Mut. Auto. Ins. Co., 30 Cal. App. 5th 397, 410 (2018) (holding that plaintiff forfeited any challenge to judgment for insurer on breach of contract claim as she did not argue it was error on appeal or suggest there were any unpaid benefits).

"Unreasonable delay in paying policy benefits or paying less than the amount due is actionable withholding of benefits which may constitute a breach of contract as well as bad faith giving rise to damages in tort." Intergulf Dev. LLC v. Superior Court, 183 Cal. App. 4th 16, 20 (2010) (citing Wilson v. 21st Century Ins. Co., 42 Cal. 4th 713, 723 (2007)). See also Palmquist v. Palmquist, 212 Cal. App. 2d 322, 331 (1963); Cal. Civ. Code § 1657 ("If no time is specified for the performance of an act required to be performed, a reasonable time is allowed."). "What is a reasonable time is a question of fact." Palmquist, 212 Cal. App. 2d at 331. Here, a genuine issue of material fact exists as to whether USAA paid Plaintiff within a reasonable time.

**B. Damages**

USAA also argues that Plaintiff has not suffered any economic loss because all policy benefits were paid in full after arbitration. Plaintiff argues that USAA's conduct required her to proceed to arbitration and incur expert witness fees, litigation costs, and the

arbitration fee, totaling $8.058. (Doc. No. 18 at 16.) Plaintiff also argues that USAA's failure to pay benefits within a reasonable time resulted in an increase of her attorney's fees and a loss of earnings because she was required to reschedule client appointments.

"Damages are an essential element of a breach of contract claim." Behnke, 196 Cal. App. 4th at 1467 (citing Navellier v. Sletten, 106 Cal. App. 4th 763, 775 (2003)). "The statutory measure of damages for breach of contract is 'the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom.'" Behnke, 196 Cal. App. 4th at 1467 (quoting Cal. Civ. Code § 3300). "Contract damages are generally limited to those within the contemplation of the parties when the contract was entered into or at least reasonably foreseeable by them at that time; consequential damages beyond the expectations of the parties are not recoverable." Applied Equipment Corp. v. Litton Saudi Arabia Ltd., 7 Cal. 4th 503, 515 (1994).

USAA argues it is "pure speculation" that Plaintiff lost money when she rescheduled clients because of the arbitration. Plaintiff is self-employed as a hair dresser. At her deposition, Plaintiff testified that she was forced to cancel appointments with clients on multiple occasions because the arbitration was cancelled and rescheduled. (Doc. No. 18-1 at 49.) Plaintiff further testified that she never recouped her cancellation costs because by rescheduling these clients she had to push out other clients' appointments. (Id.) Although Plaintiff does not submit evidence reflecting the exact amount she lost, her testimony raises a genuine issue of material fact as to whether Plaintiff incurred any economic loss.

USAA also argues that the arbitration was rescheduled because Plaintiff's prior counsel failed to timely pay the arbitration fee. In support, USAA attaches a December 12, 2016 letter its counsel sent to Plaintiff's prior counsel stating that the January 10, 2017 arbitration was taken off calendar because the arbitrator had not received Plaintiff's portion of the arbitration fee. (Doc. No. 17-4, Exh. 15 at 167.) Neither party's summary judgment papers indicate whether the arbitration was cancelled and rescheduled more than once. But Plaintiff specifically testified that there were multiple cancellations

17

18cv222 JM (KSC)

of the arbitration date, which required her to reschedule clients.[9] She also testified that she lost wages every time the arbitration was rescheduled because she had to cancel clients. Accordingly, a genuine issue of material fact exists as to whether Plaintiff lost client fees because USAA refused to pay the policy benefits due in a reasonable time, resulting in arbitration of the claim. Because a genuine issue of material fact exists, the court declines to reach USAA's other arguments on the issue of damages.

### III. Punitive Damages

California Civil Code § 3294 authorizes recovery of punitive damages in a tort action "where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice." Cal. Civ. Code § 3294(a). "'Malice' means conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others." Cal. Civ. Code § 3294(c)(1). "'Oppression' means despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights." Cal. Civ. Code § 3294(c)(2). "'Fraud' means an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury." Cal. Civ. Code § 3294(c)(3).

Plaintiff argues that she is entitled to punitive damages solely because USAA's attorney, Scott Laqua, "intentionally withheld and concealed from all concerned the existence of the all-important May 21, 2013 MRI report." (Doc. No. 18 at 22.) The court gives no weight to Plaintiff's expert testimony that Laqua intentionally withheld this report as Plaintiff provides no foundation for its expert's testimony and no evidence suggesting

---

[9] While being deposed by defense counsel, Plaintiff testified that she had to reschedule clients when USAA "would set up an appointment and then you would cancel and he would cancel. Another arbitration and then another—he would just keep canceling and every time you'd have to cancel, I'd have to cancel my clients." (Doc. No. 18-1, Exh. E at 49.) When asked if more than one arbitration date was rescheduled, Plaintiff responded, "Yes." (Id.)

that this testimony is based on personal knowledge. See Fed. R. Evid. 602. Plaintiff presents no other evidence that Laqua intentionally withheld or concealed this document from anyone. Nonetheless, in light of the contested and sparse factual record and the mysterious circumstances surrounding the May 21, 2013 MRI report, it would be premature to grant USAA's request for partial summary judgment on the question of punitive damages. If, in fact, there had been an intentional withholding of the May 21, 2013 MRI report, a jury could conceivably and reasonably conclude that Plaintiff was entitled to punitive damages. On this factual record, however, it is exceedingly difficult to determine whether, and if so, when any concealment may have taken place. The parties may raise this issue at a later date.

## CONCLUSION

For the reasons stated above, USAA's motion for summary judgment is denied in its entirety.

IT IS SO ORDERED.

DATED: May 31, 2019

JEFFREY T. MILLER
United States District Judge